**SIGNED THIS: December 06, 2006**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | In Bankruptcy |
| DARREL R. MATHIS and | ) | |
| SHERRIZAN G. MATHIS, | ) | Case No. 05-75624 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JERRY CRIPE and | ) | |
| NANCY LEWIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 06-7018 |
| | ) | |
| DARREL R. MATHIS, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

The issue before the Court is whether a debt arising out of the Debtor's contract to build a house for the Plaintiffs is

-1-

nondischargeable because of alleged fraud and embezzlement. Although Plaintiffs obtained an $88,000 state court judgment against the Debtor before this case was filed, the Plaintiffs have failed to present proof here that their complaints are anything more than contract disputes which are dischargeable.

The Debtor, Darrel Mathis, has been in the construction business most of his adult life. On June 5, 2002, Mr. Mathis entered into a Construction Contract with the Plaintiffs, Jerry Cripe and Nancy Lewis, wherein he agreed to construct a 2,468 square-foot house in the East Bluff subdivision in Petersburg, Illinois. This was the third new construction home which the Plaintiffs had built for themselves.

The Construction Contract was a "cost plus" contract. The estimated cost of construction was $169,525, but was subject to change based on the actual costs of labor and materials. The contractor's profit - the "plus" - was set at 10% and estimated to be $16,952, resulting in the total estimated construction cost of $186,477. The Construction Contract provided for the contractor's profit to be paid $1,695.20 upon signing, with three additional payments of $3,814.20, for a total of $13,137.80. A final payment was to be calculated at 10% of the actual project cost minus the $13,137.80 previously paid.

The Plaintiffs took out a construction loan to build the house. The parties set up a procedure whereby Mr. Mathis would

submit draw requests to Mr. Cripe which set forth the names of entities who had provided materials and labor for the project and how much was owed to them. The draw requests also purported to show a running total of amounts paid and amounts still due to complete the project. Funds from the construction loan were disbursed to Mr. Mathis' business account at Town & Country Bank. Mr. Mathis paid the bills out of this account. Mr. Mathis paid himself by transferring money from the Town & Country account to his personal account at Bank One.

The draw requests were made on a form entitled SWORN STATEMENT FOR CONTRACTOR AND SUBCONTRACTOR TO OWNER. Four written draw requests were made by Mr. Mathis. The first draw is undated and shows that, after various extras and credits, the new estimated total cost of the project was $202,000.73. This first draw request was for $43,107.32, and included a request for $3,814 for Mr. Mathis. Mr. Cripe approved this draw request.

The second draw request is also undated and requested a disbursement of $63,818.99. The second draw request shows proposed payments to Mr. Mathis for the regular $3,814.20 contract profit payment along with $7,650 for framing and $2,000 for additional work on the basement. Mr. Cripe approved the second draw request.

The third draw request is dated November 2, 2002, and requests $50,015.25. It also requested the regular $3,814.20 profit payment for Mr. Mathis. Mr. Mathis admitted that he was aware at the time

of the third draw request that the original contract price would not cover the cost of the house.  Mr. Cripe testified that, at the time of the third request, Mr. Mathis assured him that the project was on budget and that drywall and electrical work for the basement could be added to the project without going over the original budget.  Mr. Mathis denies making that statement and asserts that the parties agreed to add the drywall and electrical work for an additional cost.

   The fourth draw request is dated January 16, 2003, and requests $66,674.10.  Both parties testified that when they met to discuss draw request number four, they were both aware that the project was over budget and the funds from the original construction loan would be inadequate to pay to complete the home.  The fourth request has the total contract and extras at $225,310.86.  Mr. Mathis did not sign draw request number four, but Mr. Cripe approved the request and told Mr. Mathis to take it to the title company, which was disbursing the funds, and get whatever funds were left from the original loan.  Both parties agree that Mr. Cripe generally told Mr. Mathis to pay bills with the money, but both also agree that no specific bills were discussed.

    Mr. Cripe took over the project from Mr. Mathis after this discussion about the fourth draw request.  Mr. Cripe was upset that the project was far over budget.  He was also unhappy with the workmanship of Mr. Mathis.

At the time of his dismissal in January, 2003, Mr. Mathis obtained the final draw authorized by Mr. Cripe and received about $28,000, which was all that was left of the original construction loan funds. Mr. Mathis held the money in the Town & Country account for awhile because he wanted to make sure that the subcontractors were paid. He knew that contractors who failed to pay subcontractors did not stay in business very long. Once he learned that Mr. Cripe was paying the subcontractors, Mr. Mathis paid himself out of the funds in the account. He withdrew $7,930.05 on March 10, 2003, $2,069.95 on March 22, 2003, and $9,000 on April 18, 2003. Mr. Mathis claims that he was owed more than he was actually paid. Mr. Mathis calculated that he was owed profit of $20,000 based on the $225,000 cost of the house as of January 16, 2003, plus at least $27,000 for work which he did on the home.[1]

Mr. Cripe has still not finished the house. He says that he does not have the money needed to finish the project. He does not dispute that $225,000 was put into the house while Mr. Mathis was involved in the construction.

The Plaintiffs subsequently sued Mr. Mathis in state court and obtained a default judgment in the amount of $88,334.53 plus costs.

---

[1] The total costs of construction at the time of the fourth draw request was shown as $225,310.86. This amount included the original anticipated profit of $16,952. The fourth draw request does not show a recalculation of the profit amount and Mr. Mathis did not provide a precise calculation at trial.

The state court suit was based on breach of contract and consisted mainly of breach of warranty claims.  When Mr. Mathis filed his petition in bankruptcy, the Plaintiffs commenced this adversary proceeding to determine the dischargeability of Mr. Mathis' debt to them.

Count I of the Plaintiff's Amended Complaint is based on 11 U.S.C. §523(a)(2)(A), which provides as follows:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
>
> * * * *
>
> (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
>
> (A)  false pretenses, a false representation, or actual fraud(.)

11 U.S.C. §523(a)(2)(A).

Courts have historically required a creditor to establish the following elements by a preponderance of the evidence: (1) the debtor made a representation to the creditor; (2) the debtor's representation was false; (3) the debtor possessed *scienter*, i.e. an intent to deceive; (4) the creditor relied on the debtor's misrepresentation, resulting in a loss to the creditor, and (5) the creditor's reliance was justifiable.  <u>Field v. Mans</u>, 516 U.S. 59, 74-75, 116 S.Ct. 437, 446 (1995); <u>Mayer v. Spanel Intern Ltd.</u>, 51 F.3d 670, 673 (7th Cir. 1995).  The Seventh Circuit applies an expanded reading of "actual fraud" to include any deceit, artifice,

trick, or design involving direct or active operation of the mind, used to circumvent and cheat another. McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). In order to prove a claim based on actual fraud, the creditor must prove that: (1) a fraud occurred; (2) the debtor was guilty of intent to defraud, and (3) the fraud created the debt that is the subject of the discharge dispute. Id. *at* 894.

The existence of fraud for nondischargeability purposes may be inferred if the totality of circumstances presents a picture of deceptive conduct by the debtor which indicates that he or she intended to deceive or cheat the creditor. In re Schmidt, 70 B.R. 634, 641 (Bankr. N.D. Ind. 1986); In re Fenninger, 49 B.R. 307, 310 (Bankr. E.D. Pa. 1985). A breach of a contract or a failure to perform some promised act, by itself, will not render a debt nondischargeable under §523(a)(2)(A), although entering into a contract or promising an act with no intention of performance may support a finding of nondischargeability. In re Faulk, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986).

The Plaintiffs' Amended Complaint alleges the following fraudulent acts:

1. Debtor submitted invoices to Plaintiffs for amounts over and above the amounts to which the parties agreed in the contract;

2. Debtor refused to complete construction of the residence despite having been paid in full;

3. Plaintiffs advanced funds to Debtor for the express and

>           specific purpose of paying subcontractors for work
>           performed, but Debtor failed to pay said subcontractors,
>           and
>
>   4.      Debtor retained construction funds belonging to
>           Plaintiffs despite his failure to complete the work
>           required under the contract.

There is no question that Mr. Mathis submitted draw requests for amounts over and above the initial contract price. Indeed, the very first draw request indicates the project would exceed the contract price by $17,218.93. The fourth draw request added another $21,614.93 to the project. The Plaintiffs failed, however, to demonstrate anything fraudulent about the draw requests. They admit that the work was done. There was no evidence that Mr. Mathis diverted the funds from the Plaintiffs to other projects. Their only complaint is that it cost more than the initial contract price. The contract, however, contemplated changes to the scope of the work and allowed for any overages in cost projections to be paid by the Plaintiffs.

The Plaintiffs' allegation that Mr. Mathis refused to complete construction of the house after being paid in full is not supported by the evidence. It is true that Mr. Mathis stopped working on the project before the house was finished. However, he never told the Plaintiffs that he was unwilling to complete the project. Mr. Cripe removed Mr. Mathis from the project because he was dissatisfied with the workmanship of Mr. Mathis and the increasing cost of the project. Mr. Cripe knew in January, 2003, when he

discharged Mr. Mathis that there were insufficient funds from the construction loan to pay for all the expenses which had been incurred at that time. The Plaintiffs' suggestion now that Mr. Mathis was paid sufficient funds to complete the construction project is contradictory to all of the evidence presented, including Mr. Cripe's own testimony.

The Plaintiffs allege that they advanced funds for the express purpose of paying certain subcontractors and that Mr. Mathis failed to pay these subcontractors. A contractor's false affidavit certifying that subcontractors and materialmen have been paid and that there are no mechanic's or materialmen's liens against the property when in fact such subcontractors have not been paid may, in some cases, result in a nondischargeable debt under §523(a)(2)(A). In re Dallam, 850 F.2d 446, 449 (8th Cir. 1988); In re Cheek, 17 B.R. 875 (Bankr. M.D. Ga. 1982). *See also* In re Lampi, 152 B.R. 543 (C.D. Ill. 1993)(Tendering false lien waiver is willful and malicious injury to property rendering resulting debt nondischargeable pursuant to 11 U.S.C. §523(a)(6)). To reach such a result, however, the Plaintiffs would have to have presented some proof that Mr. Mathis did not use the funds from the first three draw requests which he signed to pay the subcontractors listed on those request forms. No such evidence was presented. The Plaintiffs did not present any evidence that any subcontractor shown on the first three requests was not paid or that they had to

pay any such subcontractor directly from their own funds. There was no evidence that Mr. Mathis applied any of the funds from the first three requests to other projects or converted them to his personal use.

Mr. Mathis did not sign the fourth draw request and there was no testimony presented that he represented that he would pay any particular bills with the funds. Plaintiffs presented not one bill, invoice, cancelled check, or other document as evidence that they paid any subcontractor of Mr. Mathis that Mr. Mathis should have paid from the funds disbursed to him.

The Plaintiffs' final allegation of fraud is that Mr. Mathis "retained construction funds belonging to Plaintiff despite his failure to complete the work required by the Contract." Plaintiffs' allegations relate to the Town & Country account in which they had no interest. Mr. Mathis' was the only name on the account. The account was not an escrow account. The Plaintiffs did not retain an interest in the funds after they were deposited in the Town & County account. In re Bren, 284 B.R. 681, 699 (Bankr. D. Minn. 2002). No evidence was presented to support this allegation.

There were many problems that arose during this construction project. The house could not be built where it was originally intended on the lot due to covenants and restrictions, and that resulted in additional grading being required. Due to engineering

issues, lower-level windows did not line up with picture windows above causing an aesthetic problem which needed to be remedied. Unfortunately, both parties failed to document the changes as required by the contract, resulting in confusing and conflicting testimony. The problems appear, however, to involve Mr. Mathis' workmanship and the excessive cost of the project rather than issues of fraud. *See* In re Ionna, 74 B.R. 255 (Bankr. S.D. Ohio 1987) (Debt of custom home builder to client for home built on cost-plus contract dischargeable even though cost substantially exceeded agreed maximum price plus extras.) The relief requested in Count I must be denied.

Count II of the Amended Complaint is based on 11 U.S.C. §523(a)(4), which excepts from discharge debts for embezzlement. Embezzlement is defined as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. Matter of Weber, 892 F.2d 534, 538 (7th Cir. 1989). In order to prove embezzlement, the creditor must show that the property was rightfully in the possession of a non-owner and that the non-owner appropriated the property to a use other than which it was entrusted. In re Hayden, 248 B.R. 519, 525 (Bankr. N.D. Tex. 2000). In addition, embezzlement requires fraud in fact. U.S. Life Title Ins. Co. of New York v. Dohm, 19 B.R. 134, 138 (N.D. Ill. 1982).

In this case, the Plaintiffs have not proven embezzlement.

-11-

Mr. Mathis had a right to payments under the contract once certain stages of the project were reached.  The Plaintiffs did not retain a property interest in the money Mr. Mathis received from them. The money was deposited in an account at Town & County Bank owned by Mr. Mathis.  It was not a trust or escrow account.  "One cannot embezzle one's own property." In re Bren, *supra*, 284 B.R. *at* 698. Thus, when Mr. Mathis used the funds to pay himself for work performed on the project, even if the amount due to him was in dispute, he was not embezzling.

For the foregoing reasons, the Plaintiffs have failed to prove fraud under §523(a)(2)(A) or embezzlement under §523(a)(4). Therefore, judgment will be entered in favor of the Defendant and against the Plaintiffs on the Amended Complaint to Determine Dischargeability.  The obligations of the Defendant to the Plaintiffs are discharged.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###